UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

JOSEPH NOBILE,                                          :
                                                       :
                              Plaintiff,               :
                                                       :
             - against -                               :
                                                       :
MARGOT LOUISE WATTS, a/k/a M.L.                         :
STEDMAN; SIMON & SCHUSTER, INC.;                       :    Civil Action No. 1:17-cv-00597 (LTS)
DREAMWORKS II DEVELOPMENT                              :
COMPANY, LLC; STORYTELLER HOLDING                      :
CO., LLC, d/b/a AMBLIN PARTNERS; and                   :
THE WALT DISNEY COMPANY,                               :
                                                       :
                              Defendants.              :
------------------------------------------------------------------ x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS M.L. STEDMAN AND SIMON & SCHUSTER, INC. TO DISMISS PLAINTIFF'S COMPLAINT

Elizabeth McNamara
Jeremy A. Chase
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:   (212) 489-8340

*Attorneys for Defendants M.L. Stedman*
*and Simon & Schuster, Inc.*

4836-5973-4343v.6 3901014-000687

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..........................................................................................................1

ARGUMENT..................................................................................................................................1

    I.    PLAINTIFF DISREGARDS THE GOVERNING STANDARD FOR SUBSTANTIAL
           SIMILARITY BECAUSE IT DOOMS HIS CLAIM .......................................................1

    II.   PLAINTIFF CANNOT ESTABLISH WHOLESALE TAKING OF HIS WORK..........................7

CONCLUSION..............................................................................................................................10

4836-5973-4343v.6 3901014-000687

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. Scholastic Inc.*,
739 F. Supp. 2d 642 (S.D.N.Y. 2011).................................................................6

*Arica Inst. Inc. v. Palmer*,
970 F.2d 1067 (2d Cir. 1992).............................................................................8

*Business Mgmt. Int'l, Inc. v. Labyrinth Bus. Sols., LLC*,
No. 05 Civ. 6738(MHD), 2009 WL 790048 (S.D.N.Y. Mar. 24, 2009) ..................8

*City of New York v. Geodata Plus, LLC*,
537 F. Supp. 2d 443 (E.D.N.Y. 2007) ...............................................................8

*Dean v. Cameron*,
53 F. Supp. 3d 641 (S.D.N.Y. 2014)...................................................................7

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)...........................................................................................10

*Gable v. Nat'l Broad. Co.*,
727 F. Supp. 2d 815 (C.D. Cal. 2010) ...............................................................5

*Hayuk v. Starbucks Corp.*,
157 F. Supp. 3d 285 (S.D.N.Y. 2016).................................................................8

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. 1999)...................................................................6

*Knitwaves Inc. v. Lollytogs, Ltd.*,
71 F.3d 996 (2d Cir. 1995).................................................................................10

*Lynx Ventures, LLC v. Miller*,
45 F. App'x 68 (2d Cir. 2002) ............................................................................8

*MyWebGrocer, LLC v Hometown Info., Inc.*,
375 F.3d 190 (2d Cir. 2004)...............................................................................5

*New Old Music Grp., Inc. v. Gottwald*,
122 F. Supp. 3d 78 (S.D.N.Y. 2015)...................................................................8

*Sheldon Abend Revocable Trust v. Spielberg*,
748 F. Supp. 2d 200 (S.D.N.Y. 2010)...........................................................2, 3, 9

4836-5973-4343v.6 3901014-000687

*Stratchborneo v. Arc Music Corp.*,
357 F. Supp. 1393 (S.D.N.Y. 1973)..................................................................................8

*Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*,
338 F.3d 127 (2d Cir. 2003)......................................................................................8, 10

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)...............................................................................................1

*Warner Bros. Inc. v. Am. Broad. Cos.*,
654 F.2d 204 (2d Cir. 1981)..............................................................................................5

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)............................................................................................2, 5

*Zambito v. Paramount Pictures Corp.*,
613 F. Supp. 1107 (E.D.N.Y. 1985), *aff'd*, 788 F.2d 2 (2d Cir. 1985)....................................5

**Rules**

Fed. R. Civ. P. 12(b)(6).....................................................................................................10

**Other Authorities**

Virginia Woolf, *The Voyage Out* (George H. Doran Company 1920) (originally
published 1915)....................................................................................................................9

William Makepeace Thackeray, *Vanity Fair: A Novel Without a Hero* (Penguin
Classics 2003) (originally published 1848) .................................................................9

4836-5973-4343v.6 3901014-000687

Defendants M.L. Stedman ("Stedman") and Simon & Schuster, Inc. ("S&S") (collectively the "Book Defendants") hereby submit this reply memorandum of law in further support of their motion to dismiss the Complaint and for an award of attorneys' fees and costs.

## PRELIMINARY STATEMENT

On this motion, the Book Defendants established that *The Light Between Oceans* (the "Novel") and *The Rootcutter* (the "Screenplay") are not remotely similar – let alone substantially similar.  The two works have dramatically different plots, characters, settings, themes, and "total concepts and feel," and the only similarities between the two works are a handful of highly abstract ideas, *scènes à faire*, and random common words or phrases that do not amount to copyright infringement under the well-developed case law.  Recognizing that his copyright infringement claim is doomed to fail, Plaintiff's opposition brief is an exercise in obfuscation.  Plaintiff misrepresents the governing standard and asks the Court to find substantial similarity based exclusively on his own misrepresentations of the works and a scattershot list of alleged similarities wrenched out of context.  The Court should disregard Plaintiff's self-serving descriptions and simply read and compare the two works and the actual passages Plaintiff claims were copied from the Screenplay.  "[T]he works themselves, not descriptions or impressions of them, are the real test for claims of infringement."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d Cir. 1986).  Ultimately, when one reads the actual works, only one conclusion can be reasonably reached: the Novel and the Screenplay are not substantially similar.

## ARGUMENT

I. **PLAINTIFF DISREGARDS THE GOVERNING STANDARD FOR SUBSTANTIAL SIMILARITY BECAUSE IT DOOMS HIS CLAIM**

Plaintiff wholly ignores the test for determining substantial similarity and attempts to shoehorn his claim into a variety of invented or obviously inapplicable copyright tests.  Yet, the standard for proving substantial similarity between two creative works, as here, could not be

1

more well-established.  *See Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996); Mot. at

12.  Where, as here, the underlying works contain both protectible and unprotectible elements,

the Court first disregards any non-protectible elements in the works – general ideas, stock scenes

and themes, and ordinary words or phrases – and then determines if the remaining protectible

elements are substantially similar.  *Id.* at 588; Mot. at 10-11.  In performing this comparison of

two works of fiction, the Court focuses on the plot, characters, themes, setting, and the like, often

collectively referred to as the "total concept and feel" of the works.  *See Sheldon Abend*

*Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 204-05 (S.D.N.Y. 2010) (Swain J.)

(dismissing action after comparing plots, characters, settings and total concept and feel).

In their moving brief, the Book Defendants painstakingly engaged in this comparison of

the Novel and Screenplay, demonstrating conclusively that, when stripped of their unprotectible

elements, the two works are not remotely similar.  Plaintiff's opposition – despite acknowledging

that the ordinary observer test applies (Opp. at 12) – does not even attempt to make a showing

that the respective plots, characters, settings, or themes are the same.  Plaintiff's failure is

grounded in necessity.  Any such comparison reveals that the works are starkly different.

***The Plot.***  Reading both works back-to-back, as the law directs, it is readily apparent that

they are completely different stories, one about a couple's struggle with fate to have a son, the

other about a man's efforts to do what is right, and the conflict between love and duty

surrounding a little girl with two families.  *See* Mot. at 15-20.  Nowhere in his opposition does

Plaintiff even attempt to draw coherent parallels between the plots of the works.  Instead,

Plaintiff resorts to the use of random lists of plot "similarities" that are either patently

unprotectible *scènes à faire* or gross misrepresentations of the actual expression of the works.

Such lists are routinely rejected, as this Court observed in the *Sheldon Abend* case:

> Lists are "inherently subjective and unreliable, particularly where the list
> emphasizes random similarities scattered throughout the works. . . . Such a

2

> scattershot approach cannot support a finding of substantial similarity because it
> fails to address the underlying issue: whether a lay observer would consider the
> works as a whole substantially similar to one another."

748 F. Supp. 2d at 204 n.4 (quoting *Williams*, 84 F.3d at 590).  Nonetheless, over and over,

Plaintiff's opposition itemizes the same laundry list of a handful of similar abstract elements that,

on closer inspection, reveals no similarity in actual protectable expression.  Thus, for example,

Plaintiff dwells on both works having a scene where the wife breastfeeds a newly-arrived

baby.[1]  Yet, the similarities between this plot point begin and end with the fact that suckling

occurred.  When the actual expression is compared, the description, timeline, and reasons for the

nursing differ dramatically.  In the Screenplay, Caitlin breastfeeds the minutes-old baby on the

beach in the presence of his mother's corpse despite, moments earlier, suspecting Liam had

killed her and that the baby was his illegitimate son.  Declaration of Elizabeth McNamara dated

March 28, 2017 ("McN Decl."), Ex. B at 44.  In the Novel, by contrast, hours pass between when

the couple encounters the two-month-old baby in the "early morning" (*id.*, Ex. A at 3) and when

Isabel first nurses her before dinner.  *Id.* at 95-96.  And while Plaintiff claims both women

breastfed a "starving" baby, the Novel makes clear that a bottle had already sated the hunger of

the baby (at sea for nearly two days)  (*id.* at 95) ("Now, this infant was seeking desperately for

her milk, or perhaps just for comfort, now that immediate starvation had been staved off."), and

that "only a few drops of milk came" (*id.*); while the newborn in the Screenplay can hardly be

"starving" minutes after birth.

Similarly, Plaintiff makes much of the wives praying at three graves marked by wooden

crosses in both works.  But the expression of this general idea is markedly different.  In the

Screenplay, three stillborn babies are buried in small graves, "each noted by a simple stone

---

[1] Plaintiff gratuitously suggests that the Book Defendants try to "conceal" similarities between the
breastfeeding.  Opp. at 1, 5, 15.  In fact, as even Plaintiff acknowledges, the Book Defendants *did* address the
considerable differences between the breastfeeding in the two works.  Opp. at 5 (citing Mot. at 18 n.8). Yet, Plaintiff
never attempts to explain those differences.

4836-5973-4343v.6 3901014-000687

marker and small wooden cross." McN. Decl. Ex. B at 1. In the Novel, by contrast, there are no stone markers, a rosemary bush is planted at the base of each cross (*Id.*, Ex. A at 3, 85), and though there are three crosses (the first bearing the inscription "31 May 1922 Remembered always" (*id.* at 76)), there is only one premature stillbirth. Likewise, while both wives pray, the reason for and the expression of their prayers is entirely distinct. The Novel opens with Isabel whispering the end of the Lord's Prayer after planting a rosemary bush at the base of the new driftwood cross for her only stillborn child. *Id.*, Ex. A at 3. On the other hand, there are two prayer scenes in the Screenplay. One is prompted by Liam's riding off to pay for the right to impregnate the strongman's daughter. Caitlin "makes a mad dash for the stillborn's gravesite," "frantically starts digging [up religious statues] with her bare hands" and with "urgent repentance" pleads: "Oh, God! Please forgive me. I'm sorry for everything I did. I love you so much. I promise I'll never forsake you again! Please, I beg you, stop Liam! Don't let him go through with this!" *Id.*, Ex. B at 43.[2] Beyond Plaintiff's abstract description of three wooden crosses (ubiquitous Christian symbols) and prayer, the actual scenes in the works are not remotely similar.[3]

In the end, any similarities in terms of certain plot elements are nothing more than ideas and *scènes à faire* that naturally flow from those ideas. Plaintiff chides the Book Defendants for injecting their supposed "unsworn pseudo-expert testimony" concerning such commonplace events as comforting a wife after a death or showing a husband how to hold a baby. Opp. at 4, 17. But the Book Defendants are not offering "expert" opinions: they are merely employing

---

[2] In the other scene weeks earlier, Caitlin, still bleeding from her stillbirth, kneels by the three graves in the middle of the night as "Liam watches from the window" and prays "God, our hearts are broken but I still want to trust you. Please take good care of our son . . . keep him in your hands with the other two." *Id.* at 8-9.

[3] Because the actual language of the works is controlling, not Plaintiff's characterization, for the Court's convenience, we have included with this Reply a simple chart that takes the actual language in the Novel and Screenplay produced with this motion and compares the remaining alleged "similarities" that Plaintiff still appears to rely on. The actual comparison exposes Plaintiff's claim as entirely without merit. *See* Supplemental Declaration of Elizabeth McNamara executed May 12, 2017, Ex. 1.

4836-5973-4343v.6 3901014-000687

common sense, which Plaintiff himself acknowledges is appropriate in this analysis.[4]  Opp. at 14

(citing *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 102 (2d Cir. 1999) ("When discussing how to apply

the ordinary observer standard, we have endorsed the notion that, '[g]ood eyes and common

sense may be as useful as deep study of reported and unreported cases . . .'")).

Again and again, courts in this Circuit have reached similar "common sense" conclusions

without the aid of expert opinions that certain events are *scènes à faire* "that follow naturally

from a work's theme rather than from an author's creativity."  *MyWebGrocer, LLC v Hometown*

*Info., Inc.*, 375 F.3d 190, 194 (2d Cir. 2004).   For example, in a case comparing two works

about dinosaur zoos, the Second Circuit had no trouble concluding that "electrified fences,

automated tours, dinosaur nurseries, and uniformed workers, . . . stranded characters

encountering ferocious dinosaurs, . . . characters in boats being pursued by dinosaurs, . . .

dinosaurs escaping from paddock fences" were all unprotectible *scènes à faire.  Williams*, 84

F.3d at 589, 590 n.3.  Likewise, in examining two works about superheroes, the Second Circuit

held that scenes depicting the superhero "perform[ing] feats of miraculous strength," wearing a

"tight-fitting acrobatic costume[ ]," battling "wealthy megalomaniacal villains," exercising the

"power of self-propelled flight," or leading a double life, were also unprotectible *scènes à*

*faire*.  *Warner Bros. Inc. v. Am. Broad. Cos.*, 654 F.2d 204, 209-10 (2d Cir. 1981).[5]

In case after case in this Circuit and elsewhere, courts routinely dismiss actions despite

"similar" plot elements in written works that are far more numerous and compelling than

anything identified here.  Plaintiff all but ignores this body of law and instead accuses the Book

Defendants of summarily disregarding purported similarities with "conclusory buzzwords" (Opp.

---

[4] Plaintiff's discussion of *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815 (C.D. Cal. 2010), where Plaintiff's expert was disqualified, is simply irrelevant.

[5] *See also Zambito v. Paramount Pictures Corp.*, 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985) ("That treasure might be hidden in a cave inhabited by snakes, that fire might be used to repel the snakes, that birds might frighten an intruder in the jungle . . . all are indispensable elements to the treatment of 'Raiders [of the Lost Ark's]' theme, and are, as a matter of law, simply too general to be protectible."), *aff'd*, 788 F.2d 2 (2d Cir. 1985); Mot. at 19 (collecting cases).

at 2, 17), but in the same breath he claims, without any analysis or explanation, that the Screenplay is a "unique" "far-fetched" work that is distinguishable from these and other cases cited by the Book Defendants. *Id.* at 17.  Plaintiff strains to argue that the stock elements in his Screenplay are so startlingly original that no other human could possibly have thought of the same things.  None of the plot elements he recounts – whether a woman enduring three failed pregnancies, a stillbirth followed by blood on the floor and lactation, a foundling kept by a childless couple, a wife showing her husband how to hold a baby, a dream about (a very different) drowning, a character who retches violently, the burying of a dead body, or any of the others – is unique or protectible under copyright laws.  In the end, the contrast between the plots of the two works "is so stark that any serious comparison of the two strains credulity." *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 657 (S.D.N.Y. 2011) (dismissing action against a Harry Potter book even though plaintiff's work also involved a protagonist wizard who ultimately wins a wizard competition).

*Characters.*  Plaintiff offers no rebuttal to the Book Defendants' in-depth analysis of the stark differences between the characters in the two works.  Mot. at 20-22.  The deepest Plaintiff's opposition goes is to point out that both couples are childless, want a baby, endure three failed pregnancies, live on an island, and keep a baby that washed on shore in a boat.[6]  Aside from the fact that Plaintiff admits that this is actually an unprotectible idea, (*see* Opp. at 14 ("[S]etting a childless couple desperate for a baby on a remote island and having the long-awaited baby wash up on shore in a small boat may be an idea.")), this level of generality is not remotely sufficient to establish the characters are substantially similar. *See*, *e.g.*, *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 311 (S.D.N.Y. 1999) (two half-vampire and half-human protagonists named Nicholas

---

[6] Plaintiff falsely claims that the Novel only refers to the "dinghy" once.  To the contrary, the boat is referred to as a dinghy throughout the Novel (*see* McN Decl. Ex. A at 4, 6, 7, 85, 95, and 101).  Plaintiff again retreats to the highest level of abstraction, as a "newborn baby" does not "wash up on shore" in *either* work (Opp. at 8, 17).  While a two-month-old girl washes ashore in the Novel, a *pregnant woman* washes ashore in the Screenplay, and only then gives birth to a baby.

4836-5973-4343v.6 3901014-000687

Gaunt not substantially similar).

*Setting.*  Plaintiff has no answer to the Book Defendants' discussion of the obvious differences between the settings of the two works.  Mot. at 22-23.  Plaintiff acknowledges that the Novel is set, in part, on a small uninhabited lighthouse island off the coast of Australia, and that the Screenplay is set entirely on a populated island off the coast of Ireland.  Opp. at 7.  And Plaintiff does not even try to distinguish the case law holding that island settings with far more fantastical and unique traits than either work here are not even protectible, let alone substantially similar.  *See*, *e.g.*, *Dean v. Cameron*, 53 F. Supp. 3d 641, 648-49 (S.D.N.Y. 2014) ("floating islands" are common trope and cannot be copyrighted).  Plaintiff's only response is to claim in a footnote that the couple in the Screenplay actually lives outside, as opposed to in, an ordinary village, and that the island's population is not "sizable."  Opp. at 7 n.2.  But regardless of the size of the population on the island in the Screenplay, the key distinction between settings is that the couple in the Novel was *entirely* alone on Janus – a fact that allowed them for years to live blissfully ignorant of the effect of their actions on the world at large.

*Themes.*  Not once throughout his entire opposition does Plaintiff attempt to claim that the works share any themes.  As set forth in the Book Defendants' moving brief, the themes of the two works are wholly distinct.  Mot. at 23-24.

*Total Concept and Feel.*  In effect, Plaintiff concedes the total concept and feel of the works is different when he states that Stedman "added on her own original plot elements and characters, altering the overall 'feel' of the work."  Opp. at 23.  Because any comparison of the works as a whole exposes the fundamental infirmity of his claim, Plaintiff asks this Court to ignore the analysis entirely.   As established below, Plaintiff cannot avoid this inquiry.

## II.  PLAINTIFF CANNOT ESTABLISH WHOLESALE TAKING OF HIS WORK

Plaintiff bizarrely claims that an analysis of the "total concept and feel" of the works in terms of respective plots and the like is unnecessary because the Novel is an "exact" or "near

7

4836-5973-4343v.6 3901014-000687

exact" copy of the Screenplay or elements of the Screenplay.[7]  But the cases Plaintiff cites in support of his argument uniformly involve wholesale copying of all or large portions of a particular work, not random, cherry-picked similarities like here.  *See Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127 (2d Cir. 2003) (near exact copying of central element of a rug design); *New Old Music Grp., Inc. v. Gottwald*, 122 F. Supp. 3d 78, 96 n.14 (S.D.N.Y. 2015) (exact copying of drum composition in song); *Business Mgmt. Int'l, Inc. v. Labyrinth Bus. Sols., LLC*, No. 05 Civ. 6738(MHD), 2009 WL 790048, at *7 n.7 (S.D.N.Y. Mar. 24, 2009) ("wholesale copying" of computer code); *City of New York v. Geodata Plus, LLC*, 537 F. Supp. 2d 443, 453 (E.D.N.Y. 2007) ("wholesale copying" of geographic database file).  Not one of these cases involved a work of fiction and the one case addressing textual elements involved word-for-word copying of the entire work.  *Lynx Ventures, LLC v. Miller*, 45 F. App'x 68, 70 (2d Cir. 2002) (copying all 800 descriptions of wood varieties in database).[8]  Here, a comparison of the works reveals no literal, let alone wholesale, copying.  There is simply no nexus between the case law Plaintiff cites and the reality of this case.

The only expression Plaintiff claims is exact or near exact between the works relates to four short phrases consisting of ordinary and functional words that are not protectible.  *See Arica Inst. Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) ("'[T]he 'ordinary' phrase may be quoted without fear of infringement.'") (quoting *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987)); *Stratchborneo v. Arc Music Corp.*, 357 F. Supp. 1393, 1404 (S.D.N.Y. 1973) (unless it is "especially unique or qualitatively important, there is no basis for inferring copying" of a "small, common phrase"); Mot. 18 n.10.  Plaintiff plucks these phrases at random and

---

[7] Plaintiff also incorrectly claims that the only way a copyright defendant can rebut a claim of substantial similarity is by establishing that the amount taken is *de minimis*.  (Opp. at 13-14.)  This is a mischaracterization of the law.
[8] The one "recent decision by this Court" Plaintiff claims the Book Defendants "ignore" in this regard (Opp. at 4) did not even involve literal copying, but instead applied the "total concept and feel" test finding the allegedly infringing advertising campaign was not substantially similar to Plaintiff's artworks.  *Hayuk v. Starbucks Corp.*, 157 F. Supp. 3d 285 (S.D.N.Y. 2016).

8

4836-5973-4343v.6 3901014-000687

completely ignores that in context, the meaning of the phrases is entirely different:

- **"just you and [I/me]"**: In the Screenplay, Liam tells Caitlin in a "drunken stupor" and after he accidentally killed the foundling, "I'll make it up to you. When we get to the mainland, we'll start a new life, <u>just you and I</u>," before having sex with her and impregnating her.  McN Decl. Ex. B at 97.  In the Novel, in prison, Tom recalls worrying about Isabel's state of mind in the days after the stillbirth and prior to the baby's arrival and "tr[ying] to comfort her" by saying, "We'll be all right. If it's <u>just you and me</u> for the rest of our lives, that's enough for me." *Id.*, Ex. A at 237.

- **"I hate this place"**: In the Screenplay, after an earth tremor following Caitlin's third stillbirth, the midwife asks Liam, "How many is that?  I lost count already," to which Liam "grumbles" in response while holding the stillborn child, "One too many . . . <u>I hate this place</u>." *Id.*, Ex. B at 6.  In the Novel, the phrase appears in the same flashback scene where Tom tries to comfort Isabel.  There, Isabel responds to Tom's words by running out of the house and threatening to kill herself, exclaiming, "Don't tell me to calm down, you stupid, stupid man!  It's *your* fault.  <u>I hate this place</u>!  I hate you!  I want my baby!" *Id.*, Ex. A at 237-38.  In any event, no one can claim exclusive ownership of such an everyday phrase.[9]

- **"let me hold him/her"**: In the Screenplay, Caitlin says "Oh God . . . <u>Let me hold him</u>! I want to hold my baby!" after learning her baby is stillborn. *Id.*, Ex. B at 5.  In the Novel, Isabel does not know the sex of the baby or that it is stillborn and says, "Giver her to me . . . Give me my baby! <u>Let me hold her</u>" before Tom reveals the baby boy is stillborn. *Id.*, Ex. A at 90.

- **". . . at the sight"**: In the Screenplay, Liam is "captivated <u>at the sight</u>" of Caitlin breastfeeding the baby, and it inspires him to avoid accusations he's a killer by keeping the newborn and burying the mother. *Id.*, Ex. B at 46.  In the Novel, Tom is "arrested <u>at the sight</u>" and so "alarmed" at seeing Isabel suckling the baby that he "couldn't even frame his questions." Tom "took her hand, but remained bewildered.  And deep within, his uneasiness grew." *Id.*, Ex. A at 96.  In context, the husbands' reactions are diametrically opposite.[10]

Absent Plaintiff's hyper-generalized descriptions, the passages in which these common snippets appear display a glaring dearth of actual commonality.  Incredibly, Plaintiff claims that Stedman made "cosmetic changes" to the Screenplay to hide her copying.  Opp. at 7, 22.[11]  But the vast

---

[9] *See*, *e.g.*, Virginia Woolf, *The Voyage Out* (George H. Doran Company 1920) (originally published 1915), p. 245 ("I hate this place.  I hate these people"); William Makepeace Thackeray, *Vanity Fair: A Novel Without a Hero* (Penguin Classics 2003) (originally published 1848), p. 21 ("I hate this place, and want to leave it.").

[10] Plaintiff also claims that dialogue in both works questioning the parentage of the foundling and suggesting the baby was sent by a higher power is substantially similar.  However, a simple comparison of the language and surrounding context reveals that the dialogue is not similar at all, with Liam crediting the supernatural powers of the Seeress (McN Decl. Ex. B at 48).  Opp. at 6-7.

[11] Plaintiff also accuses the Book Defendants of intentionally providing hearsay evidence to the Court with their motion because the paperback edition of the Novel contained favorable reviews that are never referred to.  Opp. 11-12.  Plaintiff clearly uses this baseless accusation as a proxy to submit further hearsay evidence of his own, in addition to his unsubstantiated claims about Stedman and her motives.  Plaintiff suggests that it is somehow relevant that his cousin allegedly confused the two works or that an online movie database included an anonymous comment

4836-5973-4343v.6 3901014-000687

differences between these works are hardly skin-deep.  Every supposed similarity Plaintiff

highlights in his opposition is based entirely on Plaintiff's description of the text, not the text

itself.  There is no literal copying and Plaintiff's suggestion to the contrary is simply

disingenuous.  The "total concept and feel" test is the only appropriate analysis here, and

Plaintiff's abject failure to engage in that analysis is fatal to his claim.[12]

## CONCLUSION

As Plaintiff cannot establish substantial similarity between the two works at issue,

Defendants M.L. Stedman and Simon & Schuster, Inc. respectfully submit that the Court should

grant their motion to dismiss the Complaint under Rule 12(b)(6).

Dated: New York, New York
      May 12, 2017

                      Respectfully submitted,

                      DAVIS WRIGHT TREMAINE LLP

                      By:  /s/ Elizabeth A. McNamara
                           Elizabeth A. McNamara
                           Jeremy A. Chase
                      1251 Avenue of the Americas, 21st Floor
                      New York, New York 10020
                      Telephone:  (212) 489-8230
                      Facsimile:  (212) 489-8340
                      Email:      lizmcnamara@dwt.com
                                    jeremychase@dwt.com
                      *Attorneys for Defendants M.L. Stedman*
                      *and Simon & Schuster, Inc.*

---

that the two works are "very similar."  Opp. at 11-12; Compl. ¶ 26.  But, as this Court has aptly observed, "opinions of third parties published in secondary materials are [ ] irrelevant."  *Sheldon Abend,* 748 F. Supp. 2d at 204, n.4.

[12] Plaintiff attempts to resuscitate his copyright claim by citing a handful of cases holding that infringement can be shown if the defendant copied the "original selection and arrangement" of unprotected elements of his work.  Opp. at 23-24.  But this line of case law has been applied almost exclusively to a narrow set of circumstances.  *See, e.g., Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991) (copying of telephone directory); *Knitwaves Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995) (copying elements of sweater designs that were "virtually the same"); *Tufenkian*, 338 F.3d at 136 (near exact copying of central element of rug design).  Even assuming this Circuit has recognized "selection and arrangement" case law in disputes about fictional works (it has not), Plaintiff cannot establish (nor does he even attempt to establish) that the scattered, unprotectible elements he identifies in the Screenplay appear in the exact same "sequence and arrangement" as the Novel.  For this additional reason, Plaintiff's Complaint must be dismissed.

4836-5973-4343v.6 3901014-000687