UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

JOSEPH NOBILE,

         Plaintiff,

    -v-

MARGOT LOUISE WATTS aka M.L.
STEDMAN, SIMON & SCHUSTER, INC.,
DREAMWORKS II DEVELOPMENT
COMPANY, LLC, STORYTELLER HOLDING
CO., LLC, d/b/a AMBLIN PARTNERS, and
ABC, INC.,

         Defendants.

---------------------------------------------------------------

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>October 16, 2017</u> |

17-cv-597 (KBF)

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

  Plaintiff Joseph Nobile is the author and copyright owner of a screenplay, alternately titled <u>The Rootcutter</u> and <u>A Tale of Two Humans</u> (the "Screenplay"), registered with the Copyright Office in 2004 and never produced as a film. Defendant Margot Louise Watts, who writes under the pseudonym M.L. Stedman, is the author of <u>The Light between Oceans</u> (the "Novel"), a best-selling novel published by defendant Simon & Schuster, Inc. ("Simon & Schuster") and turned into a major motion picture (the "Film") by defendant DreamWorks II Development Company ("DreamWorks"), and distributed by the American Broadcasting Company, Inc. ("ABC").[1]  Defendant Storyteller Holding Co., LLC ("Storyteller"),

---

[1] The complaint originally erroneously named the Walt Disney Corporation as the distributor, but the caption was subsequently changed to recognize ABC as the proper defendant.  (ECF Nos. 1, 47.)

doing business as Amblin Partners ("Amblin") is the successor-in-interest to DreamWorks.

On January 26, 2017, plaintiff filed suit, claiming copyright infringement under 17 U.S.C. §101 et seq., for both the Novel and the Film, and seeking actual damages, statutory damages, and attorneys' fees.   He claims that Watts copied substantially from his unpublished screenplay in creating the Novel.  His claims against DreamWorks, et al., are purely derivative as to his claims against Watts, as the Film is directly based on the Novel.

On March 28, 2017, Watts and Simon & Schuster (the "Novel defendants") filed a Motion to Dismiss for failure to state a claim.  (ECF No. 39.)  On March 29, 2017, DreamWorks, Storyteller, and ABC (the "Film defendants") filed a Motion to Dismiss, also for failure to state a claim.  (ECF No. 42.)  This matter was transferred to the undersigned on September 11, 2017.  Upon review of the motions, the Screenplay, the Novel, and the Film, the Court has found that, as a matter of law, the Novel and Film are not "substantially similar" to the Screenplay. Therefore, the Court GRANTS both motions.

I.    FACTUAL BACKGROUND

The factual allegations discussed below are drawn from the plaintiff's complaint (ECF No. 1) and assumed true for the purposes of this decision.

A.   The Screenwriter, Novelist, and Film Company

Plaintiff alleges that defendant Watts gained access to the screenplay through the combination of two events.  First, in 2004, plaintiff, an aspiring

screenwriter, sent his copyrighted Screenplay to several agents and film production companies, including Miramax Films ("Miramax") and Working Title Films ("Working Title"). (Complaint "Compl." ¶15.) At that time, defendant Watts was an intellectual property lawyer for Diageo PLC. (Id. ¶ 16.) In 2006, defendant Watts returned to school to study Creative Writing at Birkbeck College, where one of her instructors was Jeremy Sheldon. (Id. ¶ 17.) Sheldon had previously worked as a screenwriter for both Miramax and Working Title.[2] (Id. ¶ 18.)

In 2012, Simon & Schuster published "The Light between Oceans," Nobile's debut novel. (Id. ¶20.) The novel sold over 23 million copies and remained on the New York Times bestseller list for more than two years. (Id.)

In 2013, Grasshill Communications, Ltd. ("Grasshill"), a corporation formed by Watts that owns the copyright to the Novel, recorded a short-form option agreement with the U.S. Copyright Office, giving DreamWorks the right to make the film. (Id. ¶ 21.)

In 2016, plaintiff became aware of both the Novel and Film for the first time, when his cousin informed his about the trailer for the upcoming Film. (Id. ¶ 26.)

Since a determination of substantial similarity requires a "detailed examination of the works themselves" the Court will summarize the works at issue. Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir. 1986).

---

[2] Plaintiff points out two other potential points of access: 1) defendant Watts hired a creative writing coach and Sheldon worked as a creative writing coach; and 2) defendant Watts took a creative writing vacation in Greece and Sheldon led such vacations during the same time period. (Compl. ¶ 19.)

B. <u>The Screenplay</u>

Plaintiff's unproduced Screenplay was originally titled "The Rootcutter." (Compl. ¶ 2.)  Set on one of the Aran Islands off the western coast of Ireland "sometime after the turn of the century," its main characters are a root cutter, Liam, trying to make a living on the barren islands, and his wife, Caitlin, a pious and superstitious woman.  (ECF No. 41, Declaration in Support of Motion to Dismiss ("Decl. in Supp."), Ex. B, at 1.) The couple is barren; the Screenplay opens with Liam digging a grave for the couple's third stillborn child upon a rocky hill. (<u>Id.</u>)

The Screenplay then flashes back to the traumatic and violent stillborn birth, including Caitlin, bereft, begging to hold the baby, and a midwife warning her not to get pregnant again, for fear Caitlin would not survive another such birth.  (<u>Id.</u> at 1-6.)  The couple fears they are cursed; they approach a local doctor who similarly warns them not to take any more chances with pregnancy.  (<u>Id.</u> at 6, 12-15.) Nevertheless, Caitlin, determined to give birth, continues to beg Liam to make her pregnant.  (<u>Id.</u> at 22.)

The Screenplay's turning point comes when a wooden sailboat appears at the shore carrying a "mysterious pregnant woman" laboring to deliver a baby.  (<u>Id.</u> at 40.)  The woman begs Liam to assist her in delivering her baby, who is breach; Liam does so, severing the umbilical cord with his teeth.  (<u>Id.</u> at 40-43.)  She dies seconds after her baby is born.  (<u>Id.</u> at 42.)

4

Liam brings the baby home to Caitlin; only then does his plan take shape. (Id. at 43-47.)  He will bury the mysterious pregnant woman on the island and they will keep the baby for their own child.  (Id. at 47-49.)  Caitlin protests, but eventually acquiesces and the couple proceeds to spin a yarn about how their own stillborn child began breathing shortly after the midwife departed.  (Id. at 48-52.) The baby is subsequently heralded as miraculous across the small village.  (Id. at 52, 62-65.)

Only days later, the villagers discover the corpse of the mysterious woman. (Id. at 68.)  Rather than coming clean, Liam—again over Caitlin's protests—decides their only escape is to leave the island, and so the threesome set out in the dead of night for the mainland.  (Id. at 71-72).  They drift through the night, only to find themselves back on the other side of their own island the next day.  (Id. at 72-79.) Caitlin resolves to return the baby, but Liam convinces her to seek shelter and advice from a local monastery.  (Id. at 84-85.)  The monks assuage Caitlin's conscience, and she decides to keep the baby, believing God will not punish her after all.  (Id. at 85-87.)

In the final scenes of the Screenplay, Caitlin and Liam wait for another boat to take them to the Mainland, but an unexpected storm arises. (Id. at 87-91.)  In their struggle to escape the rain and the tidal waves, the couple begins to climb the steep hill to the monastery in treacherous conditions.  (Id. at 91.)  Moments later, a great gust of wind knocks the baby from Liam's arms and the baby plummets to his death.  (Id. at 92.)

As the couple grieves the death of their baby, more tragedy comes their way the following day when monks arriving on that part of the island are thrown overboard in a storm.  (Id. at 102.)  Among them is a young boy; Liam immediately jumps into the ocean to save him.  (Id. at 103.)  Liam saves the boy and goes back for his father, but is too exhausted, and drowns.  (Id. at 103-05.)  The Screenplay ends in the present day, with monks telling the story of Caitlin and Liam, including the fact that Caitlin had become pregnant on Liam's last night alive, and that their 100-year-old son still lived to that day.  (Id. at 105-108.)

C.  The Novel

The Novel begins on "the day of the miracle," April 27, 1926, with a young woman, Isabel, tending a cross on an island, Janus Rock, 100 miles off the coast of Australia.  (Decl. in Supp., Ex. A, 3.)  She hears a cry; seconds later, her husband, Tom, the lighthouse keeper, emerges with binoculars—he has spotted a boat.  (Id. at 3-4.)  The couple descends a path to the shore, where they find a dinghy with a dead man and a crying baby girl inside of it. (Id. at 4-5.)  Isabel convinces Tom to wait until morning to report the incident; she is entranced by the baby.  (Id. at 5-8.)

The Novel then flashes back eight years to the moment when Tom, a somewhat traumatized World War I veteran, is given his posting to Janus Rock, a tiny island uninhabited but for the lighthouse.  (Id. at 9-10.)  The first quarter of the book spans 1918-26, and chronicles Tom's posting on Janus Rock as well as his courtship and marriage to Isabel.  (Id. at 9-71).  After they marry, Isabel joins Tom on Janus Rock.  (Id. at 56.)

6

Shortly thereafter, Isabel suffers a miscarriage; Tom makes a grave to remember the baby.  (Id. at 72-76.)  The reader later learns of another miscarriage and then, just before the "miraculous day," a still born.  (Id. at 88-94.)  Isabel quickly becomes enchanted with the baby, whom she names Lucy, and insists on keeping her, despite Tom's protests.  (Id. at 96-99.)  They raise Lucy in isolation on the island for the next year and a half before returning to the mainland for a holiday, and christening Lucy.  (Id. at 100-136.)  Upon their arrival, they learn Lucy's true identity—she is the daughter of a local woman, Hannah, whose husband and baby were lost at sea, and who has been in mourning ever since.  (Id. at 130-31.)  Tom confronts Isabel, insisting they return Lucy to Hannah.  (Id. at 131.)  But Isabel prevails again, stating that to rip Lucy from "the only parents she's ever known" would be unfair.  (Id. at 131-32.)

The years go by, and when Lucy is four years old, the family returns to the mainland.  Tom, riddled with guilt, sends anonymous reassurances to the baby's birth mother that the child is safe.  (Id. at 141, 204.)  Shortly thereafter, Tom and Isabel's deception is uncovered, but Tom, in an act of gallantry, tells the local officers that keeping Lucy was his idea and that Isabel is blameless, thereby protecting her from a potential prison sentence.  (Id. at 208-237.)

Lucy is returned to Hannah—the last third of the Novel details her difficulty adjusting to life with a new mother, a new name (Grace), and her desperate attempts to run back to Isabel.  (Id. at 243-333.)  In the final moments of the Novel, a grown Lucy goes searching for Tom and Isabel in 1950, having heard Isabel is

7

dying.  (<u>Id.</u> at 334-43.)  She is too late, but is graciously received by Tom.  (<u>Id.</u>)  The Novel closes with Tom, sitting on a veranda, watching the ocean, grieving Isabel, and hoping for a better future.  (<u>Id.</u> at 343.)

## II.   LEGAL STANDARDS

### A.  <u>Copyright Infringement</u>

The Copyright Act gives owners of a copyright "exclusive rights," 17 U.S.C. § 106, to protect "original works of authorship," 17 U.S.C. § 102(a).  Not all elements of a work, however, are entitled to copyright protection; for example, copyright law applies only to the expression of ideas, and not the ideas themselves.  <u>Williams v. Crichton</u>, 84 F.3d 581, 587 (2d Cir. 1996).  Furthermore, <u>scènes à faire</u>, or sequences of events that "necessarily result from the choice of a setting or situation" do not enjoy copyright protection.  <u>Walker</u>, 784 F.2d at 50 ("Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx.")

In order to prevail on a claim for copyright infringement, a plaintiff must show: a) ownership of a valid copyright; and b) unauthorized copying of the constituent elements of the original copyrighted work.  <u>Jorgensen v. Epic/Sony Records</u>, 351 F.3d 46, 51 (2d Cir. 2003).  All that is needed to establish the first element is a certificate of registration from the United States Register of Copyright.  <u>Id.</u>  The second element ("unauthorized copying") itself has two elements—(i) that the plaintiff's work was "actually copied," and (ii) "that the copying is illegal because a substantial similarity exists between the defendant's work and the protectible

8

elements of plaintiff's." <u>Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.</u>, 602 F.3d 57, 63 (2d Cir. 2010) (internal quotation marks omitted).  Direct evidence of copying is not necessary to show actual copying; all that is required is that the plaintiff have circumstantial evidence that the alleged infringer had "access" to the allegedly infringed work and "that there are similarities between the two works that are probative of copying." <u>Jorgensen</u>, 351 F.3d at 51 (internal quotation marks omitted).

The general test for determining substantial similarity is the "ordinary observer" test—or whether a lay observer would consider the works substantially similar to one another. <u>Zalewski v. Cicero Builder Dev., Inc.</u>, 754 F.3d 95, 102 (2d Cir. 2014); <u>Williams</u>, 84 F.3d at 590.  Where the work contains both protectable and unprotectable elements, however, the analysis must be more discerning, taking care to "inquire only whether the protectible arguments, standing alone, are substantially similar." <u>Williams</u>, 84 F.3d at 588 (internal quotation marks omitted).

The Court must not "dissect [the works] into separate components, and compare only those elements which are in themselves copyrightable." <u>Gaito</u>, 602 F.3d at 66 (internal quotation marks omitted).  It must instead compare "the contested [work's] total concept and overall feel with that of the allegedly infringed work . . . as instructed by [its] good eyes and common sense." <u>Id.</u> (internal quotation marks omitted).  The Court must also resist a "scattershot approach" of comparing lists of "random similarities scattered throughout the works." <u>Williams</u>, 84 F.3d at 590.  To aid the Court in its determination of substantial similarity, the Court must

examine similarities in "total concept and feel, theme, characters, plot, sequence, pace, and setting." Id. at 588.

    B. <u>Motion To Dismiss</u>

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations. See <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949–50 (2009). This means that the Court must accept plaintiff's factual allegations in its complaint as true and draw all reasonable inferences in plaintiff's favor. See <u>Famous Horse Inc. v. 5th Ave. Photo Inc.</u>, 624 F.3d 106, 108 (2d Cir. 2010). To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Iqbal</u>, 129 S. Ct. at 1949 (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

On a motion to dismiss for copyright infringement, a district court may assume that "actual copying" occurred and proceed directly to the question of substantial similarity. <u>Gaito</u>, 603 F.3d at 63-64. Where the disputed works are either attached in the complaint or incorporated by reference therein, the district court can "consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." <u>Id.</u> at 64. If the court determines that the two works are "not substantially similar as a matter of law, [it] can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not 'plausibly give rise to an entitlement to relief.'" <u>Id.</u> (quoting <u>Iqbal</u>, 129 S. Ct. at 1950).

III.    DISCUSSION

Both the Novel defendants and the Film defendants bring motions to dismiss for failure to state a claim of copyright infringement.[3]  They claim that the works are "strikingly dissimilar," sharing little beyond "broad unprotectible ideas" and a "list of cherry-picked, often-misleading, incidental similarities."  (ECF No. 40, Defs.' Mem. of Law, at 1.)  Plaintiff asserts that an inference of unlawful copying is raised by substantial similarities between the protected, copyrightable elements in the Screenplay and the Novel.  In support, he lists 22 different similarities he characterizes as "strikingly similar in their unique expressive content," so much so that they "preclude the possibility of independent creation."  (Compl. 8-10.)  Defendants counter that the similarities are unprotectable abstract ideas and stock elements (scènes à faire) that "necessarily flow" from the shared, abstract idea of a grieving, barren couple who finds a baby.  (Defs.' Mem. of Law, at 2.)

For purposes of this Opinion, the Court assumes access to the Screenplay and considers only substantial similarity.  In making a finding of substantial similarity, the Court is required to examine similarities in "total concept and feel, theme, characters, plot, sequence, pace, and setting."  Williams, 84 F.3d at 588.  The Court examines each in turn.

---

[3] For the purposes of this decision, the Court will examine the Novel since the claim against the Film defendants is entirely derivative of the claim against the Novel defendants.

A.  Plot, Sequence, and Pace

The Court finds no substantial similarity in plot, sequence, or pace.  The pace of the two works is dramatically different:  the Screenplay takes place over the course of a few weeks, while the Novel spans decades.

Plaintiff points to the fact that both stories involve the providential arrival of a baby in a boat to a childless couple.  But "the essence of infringement lies in the taking not a general theme but its <u>particular expression</u> through similarities of treatment, details, scenes, events and characterization."  <u>Reyher v. Children's Television Workshop</u>, 533 F.2d 87 (1976) (emphasis added).  Here, while some elements of the plot are generally the same—their expression is quite different.  In the Screenplay, a laboring woman washes up on the shore at sunset; the ensuing scene is violent—a breach birth that Liam assists in, untangling the baby's umbilical cord and severing it with his teeth before the "mysterious pregnant woman" convulses and dies.  (Ex. B, at 40-43).  In contrast, in the Novel, the boat arrives in daytime, and Tom and Isabel together descend to find a man, already dead, and a tiny baby, crying and wrapped in a cardigan, with "no cuts or bruises."  (Ex. A, at 3-4.)  Despite the dead father, the scene is almost peaceful—devoid of blood and violence.

Plaintiff further points to a list of similarities in sequence—for example: 1) a stillbirth coinciding with a storm, and the wife leaving a trail of blood on the floor; 2) the bereaved mother wishing to hold her dead child after delivering a stillborn; and 3) one of the parents vomiting when their secret is discovered.  The Court finds

that these similarities are both randomly chosen, and also <u>scènes à faire</u>, flowing naturally from "identical situations."  Just as "drunks, prostitutes, vermin and derelict cars . . . appear in any realistic work about the work of policemen in the South Bronx," and "electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are <u>scènes à faire</u>, so too is blood on the floor after a dramatic birth, the wish of a mother to hold her newly-delivered child, and becoming physically sick when one thinks one's secret is out.  <u>Walker</u>, 784 F.2d at 50; <u>Williams</u>, 84 F.3d at 589.

In other cases alleging substantial similarity of plot, courts have consistently found no substantial similarity in plots with the type of similarities at issue here. For example, even where two different works told the story of "a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer . . . is discovered by the suspected murderer, . . . attacked by the murderer, and . . . ultimately vindicated," there was no substantial similarity beyond the "broad plot idea" or "premise." <u>Sheldon Abend Revocable Tr. v. Spielberg</u>, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  Similarly, here there is no substantial similarity beyond the premise of finding a baby adrift in a boat.

B. <u>Setting</u>

Plaintiff argues that the settings are substantially similar as both are set on "remote storm-swept island[s]."  (Compl. ¶23(a).)  However, a setting of a remote storm-swept island is not copyrightable; scores of renowned works of literature—

Robinson Crusoe, The Tempest, The Lord of the Flies, and The Odyssey, for example—have employed such a setting.  Daniel Defoe, Robinson Crusoe (1719); William Shakespeare, The Tempest (1623); William Golding, The Lord of the Flies (1954); Homer, The Odyssey (c. 8th century B.C).  Indeed, island settings far more specific have frequently been found uncopyrightable.  See, e.g., Dean v. Cameron, 53 F. Supp. 3d 641, 648-49 (S.D.N.Y. 2014) (finding the idea of "floating islands" uncopyrightable); Williams, 84 F.3d at 589 (finding the setting of a dinosaur zoo on an island not protectable).

Furthermore, here the settings are far more distinct than plaintiff implies; the Screenplay is set entirely on an Irish island that is populated, if barren of critical natural resources, while the Novel is set on an Australian island where Tom, Isabel, and later Lucy live in total isolation.  In addition, the Novel takes place in substantial part upon mainland Australia.

The plaintiff further argues that the settings are similar in that both are set "in the early twentieth century."  (Compl. ¶ 23(b).)  This seems to the Court a vast oversimplification—while the Novel takes places between 1914-1950, and is deeply rooted in that time, vividly informed by flashbacks of World War I, in particular, the Screenplay's time frame is only indicated by a caption at the opening of the movie: "It Was Sometime After the Turn of the Century."  (Ex. B, 1.)  The Court finds that the setting is neither substantially similar nor does it arise from protectable elements.

14

C.  Characters

Plaintiff argues that the characters are substantially similar, in that the core of the story is a "desperate childless couple longing for a baby."  (Compl. ¶ 23(c).) This statement is true, if overly simplistic.  Indeed, both works focus on childless couples who make a morally compromised decision to keep a baby not their own.

However, the "bar for substantial similarity in a character is set quite high." Sheldon Abend, 748 F. Supp. 2d at 208.  Clearing the bar is no easy feat—for example, self-centered bachelors in their mid-thirties who pursued love interests and became trapped in a repeating day—have not been considered substantially similar since the similarities existed at "a level of abstraction[] too basic" to permit an inference of unlawful copying.  Arden v. Columbia Pictures Indus., Inc., 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) (internal quotation marks omitted).  Furthermore, as Judge Learned Hand stated, the "less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."  Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930).

Liam and Caitlin (the Screenplay protagonists) are not well developed; instead they are archetypes.  While they call each other by name in the Screenplay, the Screenplay routinely refers to them as simply "Rootcutter" and "Rootcutter's Wife," as if to imply a fable-like existence.  To the degree that they are developed, they are palpably different than Tom and Isabel.  Caitlin is a highly-superstitious, God-fearing woman whose movements are almost entirely guided by her faith in a

15

higher power.  Liam is impulsive and driven to provide his wife with a baby at all costs.

In contrast, Tom is a World War I veteran with a complex family history, a traumatic war experience, and a strong, if wavering, moral compass.  Isabel is a doting mother who finds a way to convince herself that Lucy's mother must be dead. Even when she does discover that Hannah is alive, she is primarily motivated by Lucy's well-being, however misguidedly.

The Novel features other fully-drawn characters: Lucy, Hannah, and Isabel's parents, for example, all play critical roles in the psychological drama.  The Screenplay, in contrast, is populated primarily with characters named "Midwife," "Jittery Old Man," "Relieved Male Villager," and "Woman under Blanket."  Outside of Liam and Caitlin, in other words, the characters are sparsely drawn, and mainly vehicles to advance Liam and Caitlin's own narrative.

The Court therefore does not find that the characters are substantially similar.

D. Theme

The Court concedes that there are thematic similarities—both works wrestle with what it means to take a child for one's own when one is desperate to give birth, and the psychological and spiritual consequences of that decision.  However, this similarity relates to the unprotectable idea of a childless couple finding a seemingly motherless baby.  As in Williams, "once one goes beyond this level of abstraction, the similarity in themes disappears."  (finding that the themes of Jurassic Park and

16

a series of children's adventure books called <u>Dinosaur World</u>, also about children exploring a sometimes-dangerous dinosaur zoo, were not substantially similar). <u>Williams</u>, 84 F.3d at 589.  Indeed, the main themes in the Screenplay are divine retribution and fate, where the main themes of the Novel are a child twice displaced, parents struggling with the right choice for that child, and forgiveness.

   E.  <u>Total Concept and Feel</u>

Finally, and for the reasons discussed above, the total concept and feel of the works is distinct.  As in <u>Reyher</u>, where the Court found that a developed story of family life in the Russian Ukraine was not substantially similar in total feel as a Sesame Street magazine story "barren of meaningful setting or character development" so, here, the stories are dramatically different in terms of the detail with which they sketch their characters and the themes they explore, as well as the vastly different pace mentioned above.  <u>Reyher</u>, 533 F.2d at 92.

Plaintiff argues that the "total concept and feel" test is inapposite, arguing that it applies to cases of inexact copying only.  Where, as he alleges happens here, the copy is instead "wholesale" and "verbatim," to apply the "total concept and feel" test "effectively immunizes the infringer who appends original material to plagiarized text."  <u>Lynx Ventures, LLC v. Miller</u>, 45 Fed. App'x 68, 70 (2d Cir. 2002).  However, there is no showing here that defendants have "verbatim" copied from plaintiff.

The test plaintiff proposes has been used when, for example, "the [defendants'] abstracts appear to be direct, if not word-for-word, translations of the

[plaintiff's] articles, edited only for clarity. . . . The abstracts track the information in the articles sentence by sentence, in sequence; only occasionally do the abstracts combine two [of plaintiff's] sentences, divide a sentence, or rearrange the facts among different sentences." <u>Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.</u>, 166 F.3d 65, 71 (2d Cir. 1999). There, the court determined substantial similarity without discussion of total concept or feel.

The plaintiff fails to provide a sufficient rationale for why this Court should consider this a case of "verbatim" copying—offering only four words, "I hate this place," which are exactly the same between the two works, and five other phrases that are similar to each other. (Compl. ¶ 23.) As such, the Court rejects plaintiff's argument that a different test should apply.

In sum, after examination of the setting, characters, theme, plot, sequence, pace and total concept and feel of the Novel and the Screenplay, this Court concludes they are not substantially similar. As such, plaintiff has failed to state a claim against the Novel defendants.

IV.   <u>The Film Defendant's Motion to Dismiss</u>

Plaintiff's claim against the Film defendants is wholly derivative of his claim against the Novel defendants; he does not allege any independent infringement by the Film defendants. Rather his infringement claim is based upon the fact that the "Film is closely based" on the Novel. (Compl. ¶ 23.)

Since, as discussed because, the plaintiff has failed to state a claim against the Novel defendants, his claim against the Film defendants necessarily fails.

18

V.     <u>CONCLUSION</u>

For the reasons stated above, the defendants' Motions to Dismiss are GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 39 and 42 and to terminate the case.


SO ORDERED.

Dated:        New York, New York
              October 16, 2017

_____
        KATHERINE B. FORREST
        United States District Judge

19